UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Verizon New England Inc.,

    Plaintiff,

v.

New Hampshire Public Utilities
Commission,

    Defendant.

FILED 2/19/04 at 5:38pm
U.S. DISTRICT COURT
24-HOUR DEPOSITORY

Civil Action No.

C. 04-65-B

## COMPLAINT

Plaintiff Verizon New England Inc., d/b/a Verizon New Hampshire ("Verizon"), alleges as follows:

### NATURE OF THE ACTION

1.     This action challenges a January 16, 2004 rate order of the New Hampshire Public Utilities Commission. *See* Order Establishing Cost of Capital (Order No. 24,265), *Investigation into Cost of Capital*, Docket No. DT 02-110 (N.H. Pub. Utils. Comm'n Jan. 16, 2004) ("*Cost of Capital Order*"). The *Cost of Capital Order* sets the cost of capital to be used in calculating the wholesale rates for facilities that Verizon is required by federal law to lease to its competitors. The *Cost of Capital Order* violates the Communications Act as amended by the Telecommunications Act of 1996 ("Act" or "1996 Act"), 47 U.S.C. § 151 *et seq.*, by expressly disregarding and violating both the Act and the regulations of the Federal Communications Commission ("FCC") that specifically bind the New Hampshire Public Utilities Commission ("PUC") in determining the cost of capital for federally mandated wholesale facilities and services known as unbundled network elements ("UNEs") that Verizon is required to offer to its

competitors. In fact, the PUC applied a methodology that federal law unequivocally prohibits, resulting in a cost of capital figure that is the *lowest* of the northeastern states in which Verizon does business. Indeed, the cost of capital adopted in the *Cost of Capital Order* is substantially lower than the cost of capital the PUC adopted less than three years ago, despite the fact that the risks faced by Verizon in providing facilities to its competitors, and hence its required cost of capital, clearly have only increased during that time. The *Cost of Capital Order* results in below-cost, confiscatory wholesale rates and is contrary to law.

## JURISDICTION AND VENUE

2. This action arises under 47 U.S.C. §§ 251, 252 and 47 C.F.R. §§ 51.501-.513. This court has jurisdiction under 28 U.S.C. §§ 1331, 1367, 2201, 2202, and 47 U.S.C. § 252(e)(6).

3. Venue is proper under 28 U.S.C. §§ 1391(a)(1) and (a)(2) because the Defendant resides in this District and a substantial part of the events giving rise to the claims occurred in this District.

## THE PARTIES

4. Verizon is a New York corporation with its principal place of business in New Hampshire at 900 Elm Street, Suite 1926, Manchester, NH 03101-2008. It is an incumbent local exchange carrier that provides local telephone service in New Hampshire.

5. Defendant New Hampshire Public Utilities Commission ("PUC") is a governmental body organized under the laws of the State of New York, and has authority to regulate telecommunications carriers providing intrastate service in New Hampshire. The PUC is headquartered at 8 Old Suncook Road, Concord, NH 03301-7319.

2

## **STATEMENT OF FACTS**

### I. INTRODUCTION

#### A. Traditional Regulation of Retail Telecommunications Services Rates

6. Historically, states authorized one local exchange carrier to offer local services to consumers within the state. That local exchange carrier received a long-term exclusive franchise, and thus faced little or relatively little risk. In return for that exclusive service franchise, regulators required the carrier to meet a host of service obligations and regulated the retail rates the carrier charged its customers.

7. Under that historical regime, the state commission was responsible for regulating all of the carrier's intrastate services. The FCC was authorized to regulate the carrier's rates for *interstate* services. *See* 47 U.S.C. § 152(a).

8. Traditionally, state regulators used a "rate of return" methodology to regulate retail rates. That methodology bases rates on the local exchange carrier's historical or "embedded" costs. Embedded costs are the costs that the provider has actually incurred. Rate-of-return regulation assumes that, in exchange for providing the incumbent carrier with an exclusive franchise, the regulator may require that the carrier charge consumers no more than is necessary to recover a "fair rate-of-return" on the amount of "prudently invested" capital the carrier has spent. *Verizon Communications, Inc. v. FCC*, 535 U.S. 467, 486 (2002). In applying rate-of-return regulation, the regulator looks to the utility's actual historic costs and uses its judgment about whether the utility's capital structure is appropriate and whether its management is efficient. *See id.* at 484.

9. In many states, rate-of-return regulation has been phased out, especially as the 1996 Act eliminated incumbent carriers' exclusive franchises, *see* 47 U.S.C. § 253(a), and competition has provided market-based incentives for all carriers, including the incumbent, to keep rates low without burdensome regulatory intervention. New Hampshire, however, is one of the handful of states that continues to apply a rate-of-return regulation methodology in regulating retail rates. *See, e.g., Appeal of Conservation Law Foundation*, 127 N.H. 606, 633 (1986). Thus, the PUC determines an appropriate "rate of return," which is similar to the "cost of capital," when setting retail rates for Verizon's intrastate services.

### B. The Telecommunications Act of 1996

10. Congress established an entirely new regulatory regime for telecommunications services in the 1996 Act. The Act both imposes new obligations on incumbent local exchange carriers ("ILECs") in all states and fundamentally alters the jurisdictional division between the FCC and state regulators.

11. The 1996 Act was designed to open up the local network to competition. In order to advance this goal, the 1996 Act eliminated exclusive telecommunications franchises, as noted above, *see* 47 U.S.C. § 253(a), and created a federal requirement that incumbent providers lease portions of their networks to their competitors in order to help competitors enter the market and obtain market share before investing in their own facilities. In particular, the 1996 Act requires Verizon, as an ILEC, to turn over parts of its network — called "unbundled network elements" or "UNEs" — to its competitors for their use in providing telecommunications services in direct competition with Verizon. *See* 47 U.S.C. § 251(c)(3).

12. The Act permits competitors in New Hampshire to lease from Verizon the full suite of facilities they need to provide local telephone service, making it possible for competitors

to capture Verizon's market share without risking any investment in their own facilities. The facilities competitors may lease from Verizon include the "loop" (the copper and fiber cable connecting the customer's premises to the phone company's switching office, or "central office"), "switching" (the use of Verizon's computerized switch to connect one end user's call to another's), and "transport" (the ability to transport a call across Verizon's network, among Verizon's switches). In addition, the FCC specifically required that incumbents provide these "unbundled" network elements in combination as an entire integrated platform. *See* 47 C.F.R. § 51.315. Competitors that are entitled to lease an ILEC's facilities include prominent companies such as AT&T and MCI, as well as numerous smaller competitors, many of which currently provide local service in New Hampshire. In 2003, Verizon's competitors in New Hampshire leased from it 23,000 UNE platforms ("UNE-P") on average per month, and served customers using those UNE-Ps without any facilities of their own. *See* Exhibit 1 in Support of Plaintiff's Motion for Preliminary Injunction, Declaration of Alan S. Cort ¶ 6 ("Cort Decl."). Verizon's competitors leased 38,000 UNE loops from Verizon on average per month. *See id.* ¶ 3.

13. The 1996 Act expressly dictates the manner in which the rates for UNEs must be established. Specifically, the Act mandates that the prices for UNEs "shall be based on the cost . . . of providing the interconnection or network element," and "may include a reasonable profit." 47 U.S.C. §§ 252(d)(1)(A), (B). Rates also must be "just and reasonable." *Id.* § 251(c)(3). The Act authorizes the FCC — and only the FCC — to adopt rules implementing this standard. *See Verizon Communications*, 535 U.S. at 489; *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 378 (1999) ("The FCC has rulemaking authority to carry out the 'provisions of this Act,' which include §§ 251 and 252 . . . .") (quoting 47 U.S.C. § 201(b)).

14.     The FCC interpreted the Act's "cost" dictate as requiring UNE rates to be based on a new methodology called "Total Element Long Run Incremental Cost" or "TELRIC."[1] The FCC has explained the principles underlying TELRIC on numerous occasions, including, most recently, in its *Triennial Review Order* in August 2003,[2] and in a notice of proposed rulemaking in September 2003.[3]

15.     In general, TELRIC is a forward-looking methodology that attempts to estimate what it would cost today to build a hypothetical, new local network from the ground up (with the exception of the locations of the existing central offices) "that can provide all the services its current network provides, using the least-cost, most-efficient technology currently available." *TELRIC NPRM* ¶ 17. The FCC has stated that "a forward-looking cost approach more closely approximates the costs that would exist in a competitive market than does an historical cost approach by revealing potential efficiencies that might not otherwise be apparent." *Id.* ¶ 30. A basic assumption of TELRIC is that the market is perfectly competitive, so that ILECs' UNE rates would always be constrained by the costs another carrier could obtain by using the latest, least-cost, most efficient technology. *See Triennial Review Order* ¶ 670 ("In the competitive market assumed under TELRIC, we assume that the most efficient technology currently available will be deployed by at least one carrier, and that the value of all competing networks,

---

[1]     First Report and Order, *Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, 11 FCC Rcd 15499 ¶ 678 (1996) ("*Local Competition Order*").

[2]     *See* Report and Order and Order on Remand and Further Notice of Proposed Rulemaking, *Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 18 FCC Rcd 16978 (2003) ("*Triennial Review Order*").

[3]     *See* Notice of Proposed Rulemaking, *Review of the Commission's Rules Regarding the Pricing of Unbundled Network Elements and the Resale of Service by Incumbent Local Exchange Carriers*, 18 FCC Rcd 18945 (2003) ("*TELRIC NPRM*").

and the prices for elements of those networks, will be constrained by the value of the more efficient network."); *TELRIC NPRM* ¶ 16 ("TELRIC is based on the assumption that competition would constrain the value of an incumbent LEC network and the price that could be charged for use of that network."). In general, then, the "cost" of a UNE under TELRIC is intended to "equal[] the price that an incumbent LEC would be able to charge for an element in a competitive market." *Id.*

16.  The 1996 Act expressly prohibits the use of rate-of-return regulation to set wholesale UNE rates. Specifically, section 252(d)(1)(A)(i) provides that wholesale UNE rates must be based on the "cost . . . *determined without reference to a rate-of-return or other rate-based proceeding* . . . of providing the . . . network element." 47 U.S.C. § 252(d)(1)(A)(i) (emphasis added). The Supreme Court has explained that the 1996 Act is thus "an explicit disavowal of the familiar public-utility model of rate regulation (whether in its fair-value or cost-of-service incarnations) presumably still being applied by many States for retail sales." *Verizon Communications*, 535 U.S. at 489. Similarly, TELRIC is not a "historical cost" ratemaking methodology.

17.  Although the FCC determines the methodology for setting UNE rates, the states are charged with implementing this methodology and adopting specific UNE rates for the ILEC in each state. *See* 47 C.F.R. § 51.503(b) (states are obligated to apply FCC pricing methodology for UNEs); *Verizon Communications*, 535 U.S. at 489 (stating that the FCC is responsible for "setting a basic, default methodology for use in setting rates when carriers fail to agree, but leaving it to state utility commissions to set the actual rates"). Whereas the FCC traditionally did not become involved with state rate regulation at all, the Act creates a unique "hybrid jurisdictional scheme" in which the FCC shares responsibility with the states with respect to the

7

regulation of rates for UNEs. *Verizon Communications*, 535 U.S. at 489. The Act thus substantially shifts the prior jurisdictional division among the FCC and the states, and compels the states to serve essentially as agents of the federal government in setting UNE rates. *See Iowa Utils. Bd.*, 525 U.S. at 384 ("It is the States that will apply [the FCC's] standards and implement [the FCC's prescribed] methodology, determining the concrete result in particular circumstances."). Indeed, resulting state UNE decisions are subject to immediate review in federal court to ensure state compliance with the federal rules, *see* 47 U.S.C. § 252(e)(6), and the constitutional requirement of just compensation. *See* U.S. Const. amend V. If a state fails to set UNE rates as required by the 1996 Act, the FCC can act in its place. *See* 47 U.S.C. § 252(e)(5).

18. Even under the 1996 Act, however, *retail* rates continue to be regulated by the states pursuant to state, rather than federal, law. Thus, UNEs, which the ILEC provides at wholesale to other carriers under compulsion of federal law, and retail services, which the ILEC has historically provided as its main line of business primarily under state law, are subject to entirely different regulatory regimes.

## II. COST OF CAPITAL

19. The TELRIC cost of any UNE is the sum of three components — operating expenses, depreciation, and cost of capital. *See Triennial Review Order* ¶ 671.

20. A firm's "cost of capital" is the percentage return the firm must earn in order to provide lenders and investors with the return *they* require as an inducement to lend or invest funds in the company. As the FCC has explained, the cost of capital is "the cost a firm will incur in raising funds in a competitive capital market." *TELRIC NPRM* ¶ 13. The cost of capital is the product of three components: the cost of debt, the cost of equity, and the firm's capital structure (that is, the proportion of debt to equity).

8

21. The rate that investors will demand before they are willing to invest in a particular firm's business will depend on an assessment of that firm's risk. *See id.* Therefore, a proper cost of capital must account for all relevant risks that lenders or investors would perceive, including competitive risks and any particular regulatory risks faced by the firm that might affect its ability to earn the required return.

22. Generally speaking, an increase in the cost of capital will produce a corresponding increase in UNE rates, while a decrease in the cost of capital will produce a corresponding decrease in UNE rates. A cost of capital for UNEs that is too low will not permit the ILEC to recover the return required to compensate it and its investors for the costs it incurs and the risks it faces in providing UNEs to its competitors.

23. The FCC has stated that the cost of capital used for setting UNE rates under TELRIC *must* be consistent with the forward-looking, competitive assumptions that guide the selection of all other inputs used in UNE pricing. *Id.* ¶ 84. Since, as explained above, TELRIC requires the assumption of a hyper-competitive market, the cost of capital input used for UNE rates "should [likewise] reflect the risks of a competitive market, . . . [including] the risk of losing customers to other facilities-based carriers." *Id.* ¶ 83 (citing *Triennial Review Order* ¶¶ 680-84). As the FCC explained, it would make no sense to set some rates based "on an assumption of a forward-looking network that uses the most efficient technology . . . without also compensating for the risks associated with investment in such a network." *Triennial Review Order* ¶ 682. Any other approach "would reduce artificially the value of the incumbent LEC network [assumed by the pricing methodology] and send improper pricing signals to competitors." *Id.*

9

24. The FCC has further explained that a TELRIC cost of capital must take into account the "*risks associated with the regulatory regime to which a firm is subject.*" Reply Brief for Petitioners United States and the Federal Communications Commission, *Verizon Communications, Inc. v. FCC*, Nos. 00-511 *et al.*, 2001 WL 881216, at *12 n.8 (U.S. July 23, 2001) (emphasis added).

### III. HISTORY OF THE PUC'S COST OF CAPITAL PROCEEDING

25. On July 6, 2001, the PUC issued an order setting state-wide UNE rates pursuant to the 1996 Act.[4] In that order, the PUC expressly noted that it was applying the TELRIC methodology, *see Wholesale Rate Order* at 5, and in so doing, adopted a cost of capital of 10.46 percent.

26. On June 27, 2002, Verizon applied to the FCC for authority to provide long distance service in New Hampshire under section 271 of the Act. *See* 47 U.S.C. § 271. Section 271 governs the conditions under which the FCC may permit the Bell Operating Companies ("BOCs") that were divested from AT&T in 1984, such as Verizon, to re-enter the long distance market. One of the requirements under section 271 is that a BOC provide UNEs at rates consistent with sections 251 and 252 of the Telecommunications Act and the FCC's rules thereunder, including TELRIC.

27. On September 25, 2002, the FCC approved Verizon's rates for New Hampshire — some of which Verizon had voluntarily reduced in connection with its section 271 application — as TELRIC-compliant and granted Verizon authority to provide long distance services in New

---

[4] *See* Exhibit 3 in Support of Plaintiff's Motion for Preliminary Injunction, Order No. 23,738, *Bell Atlantic Petition for Approval of Statement of Generally Available Terms Pursuant to the Telecommunications Act of 1996*, Docket No. DE 97-171 (N.H. Pub. Utils. Comm'n July 6, 2001) ("*Wholesale Rate Order*").

10

Hampshire.[5] Specifically, the FCC concluded that Verizon's rates for New Hampshire "fall within the range that a reasonable TELRIC-based rate proceeding would produce." *New Hampshire § 271 Order* ¶ 37.

28. On June 28, 2002, the PUC announced that it would initiate a proceeding to examine whether to adopt an updated cost of capital for Verizon's UNE rates. The PUC later stated that, when an updated cost of capital figure was established, not only would Verizon be immediately required to update existing UNE rates, but also the new cost of capital would apply to UNE rates to be set in a future proceeding.[6] The PUC subsequently stated that its investigation into the cost of capital would consider both the cost of capital to be used in calculating *UNE* rates and the cost of capital to be used in calculating Verizon's rates for *retail* services it provides to its end-user customers.[7]

---

[5] Memorandum Opinion and Order, *Application by Verizon New England Inc., Verizon Delaware Inc., Bell Atlantic Communications Inc. (d/b/a Verizon Long Distance), NYNEX Long Distance Company (d/b/a Verizon Enterprise Solutions), Verizon Global Network Inc., and Verizon Select Services Inc. for Authorization to Provide In-Region, InterLATA Services in New Hampshire and Delaware*, 17 FCC Rcd 18600 ¶ 1 (2002) ("*New Hampshire § 271 Order*").

[6] *See* Exhibit 6 in Support of Plaintiff's Motion for Preliminary Injunction, Prehearing Conference Order (Order No. 24,053), *Cost of Capital Investigation*, Docket No. DT 02-110, at 5 (N.H. Pub. Utils. Comm'n Sept. 16, 2002).

[7] *See* Exhibit 5 in Support of Plaintiff's Motion for Preliminary Injunction, Order Clarifying Scope and Procedural Schedule and Partially Granting Motion to Compel (Order No. 24,089), *Cost of Capital Investigation*, Docket No. DT 02-110, at 2 (N.H. Pub. Utils. Comm'n Nov. 27, 2002).

## IV. THE COST OF CAPITAL ORDER

29. On January 16, 2004, the PUC issued its *Cost of Capital Order*.[8/] In the *Cost of Capital Order*, the PUC adopted a cost of capital of 8.2 percent. *Cost of Capital Order* at 70. This figure represented more than a 20 percent reduction from the previous figure — 10.46 percent — that the FCC had approved as TELRIC-compliant less than two years before. The PUC stated that this cost of capital figure would be used immediately to reduce Verizon's UNE rates. *See id.* at 71 (directing Verizon to file revised tariffs "to reflect the cost of capital as found in this Order by March 16, 2004").

30. That figure will result in a reduction in the wholesale UNE rates Verizon is permitted to charge, even though the existing rates were recently found to be TELRIC-compliant by the FCC. Those rates will not compensate Verizon for the costs it actually incurs to provide UNEs and are therefore confiscatory.

31. The PUC's *Cost of Capital Order* expressly disclaims any intention of complying with the FCC's TELRIC rules, asserting that "[t]here is no requirement under FCC rules or the [1996 Act] that a separate cost of capital be specified for UNE rates." *Id.* at 44. In fact, despite being commenced specifically to set the cost of capital for rates applicable to the UNEs required under the 1996 Act, the 71-page *Cost of Capital Order* barely references the 1996 Act at all. The *Cost of Capital Order* hardly mentions the FCC's rules, policies, or precedents regarding the standards for determining the TELRIC cost of capital, and it mentions the FCC's *Triennial Review Order*, which is the FCC's most recent and definitive statement concerning the appropriate cost of capital for UNEs, only once in its analysis. *See id.* at 43.

---

[8/] *See* Exhibit 2 in Support of Plaintiff's Motion for Preliminary Injunction, Order Establishing Cost of Capital (Order No. 24,265), *Investigation into Cost of Capital*, Docket No. DT 02-110 (N.H. Pub. Utils. Comm'n Jan. 16, 2004) ("*Cost of Capital Order*").

32. Instead, the *Cost of Capital Order* relies on legal authority consisting almost exclusively of state law cases that pre-date the 1996 Act and that have no application to the rates for UNEs under federal law. In describing "the overall legal framework that should guide our decision," for example, the PUC stated that the "most comprehensive review of the New Hampshire law on cost of capital" may be found in a 1986 *state* law case, *Appeal of Conservation Law Foundation*, 127 N.H. 606 (1986). *Cost of Capital Order* at 40.

33. The PUC also applied a rate-of-return methodology in determining the UNE cost of capital input, in direct contradiction to the Act and the FCC's rules. For example, in choosing a capital structure (the proportion of debt to equity financing), the PUC stated that "capital structure would preferably be based upon book value, not market value." *Id.* at 48. The PUC explained that it considered the various proposed capital structures "from the perspective of what a reasonable and prudent manager would choose for a capital structure" — the very terminology used by the Supreme Court to epitomize the rate-of-return methodology. *Id.* at 50. The PUC reached this conclusion notwithstanding the Supreme Court's statement that, under the Act, there is a "heavy presumption against any [costing] method resembling the traditional embedded-cost-of-service model of ratesetting." *Verizon Communications*, 535 U.S. at 512.

34. The PUC also departed from the TELRIC rules by using a historical rather than a forward-looking approach to determining the appropriate cost of capital, even though *all other* UNE rate inputs approved by the PUC are based on the forward-looking TELRIC methodology. For example, the PUC set the cost of long-term debt "based upon the embedded [*i.e.*, historic] cost of debt for Verizon New England." *Cost of Capital Order* at 57. The PUC expressly rejected Verizon's proposal, which the PUC noted was based on Verizon's "thesis that TELRIC requires forward-looking inputs to the cost of capital calculation." *Id.* The PUC reasoned

13

instead that "the embedded cost of debt presumably demonstrates prudent, efficient management" and thus provided the proper basis for the cost of debt. *Id.* at 57-58.

35. In addition, the PUC failed to set a cost of capital that accounted for increasing competition in New Hampshire faced by Verizon, much less the assumption of a perfectly competitive market required under TELRIC. The FCC has "specifically recognized that increased competition would lead to increased risk, which would warrant an increased cost of capital." *Triennial Review Order* ¶ 681 (citing *Local Competition Order* ¶ 683). The *Cost of Capital Order* is on its face inconsistent with this requirement, because it *reduced* the 2001 cost of capital figure over 20 percent — and reduced the 11.25 percent cost of capital the PUC adopted for Verizon's *monopoly* retail service in 1990 by 25 percent — despite the inescapable fact that competition clearly has been *increasing* during that same time period, and despite the fact that Verizon as a wholesale provider of UNEs today clearly faces *substantially* more competitive and regulatory risk than it did as a provider of monopoly services 14 years ago.

36. For example, the FCC's data indicates that in July 2001, when the PUC adopted its original 10.46 percent TELRIC cost of capital, competitors served eight percent of New Hampshire's telephone lines. By June 2003, competition had *doubled*, such that competitors served 16 percent of the state's lines.[9]

37. In addition, Verizon faces increasing competition from wireless providers. In June 2000 the state had 309,263 mobile telephone subscribers, increasing to 445,181 in June 2001, 529,795 in June 2002, and 598,504 in June 2003. FCC Local Competition Report, Table 13. In fact, mobile wireless penetration has grown more rapidly in New Hampshire than

---

[9] *See* Exhibit 7 in Support of Plaintiff's Motion for Preliminary Injunction, Federal Communications Commission, Local Telephone Competition: Status as of June 30, 2003, Table 7 (rel. Dec. 22, 2003) ("FCC Local Competition Report").

14

nationwide.[10] Wireless competition is an especially serious threat to Verizon's UNE and retail businesses, because it presents a means of bypassing the traditional local telephone network altogether, allowing competitors to serve consumers and capture Verizon's market shares while depriving Verizon of all wholesale *and* retail revenues.

38.  Competition now also exists from other providers that are upgrading their telecommunications offerings to include voice telephony. Cable telephony providers already offer service to 15 percent of U.S. homes, have penetration rates as high as 40 percent in most mature markets, and are adding tens of thousands of new subscribers each month. Similarly, voice-over-IP ("VoIP") service provides a significant and rapidly growing source of competition. AOL Time Warner recently announced that it would provide VoIP service on a *nationwide* basis and be in "most, if not all, of its markets" by the end of 2004. Comcast is conducting trials of VoIP service. Vonage — a provider of exclusively VoIP services — offers service to customers throughout the country, including New Hampshire.

39.  As a result of this competition, Verizon's number of total lines served has decreased for several consecutive years. From the time since the PUC adopted a cost of capital figure of 10.46 percent in July 2001 until June 2003 (when the FCC's data stops), Verizon has lost nearly 11 percent of its access lines in New Hampshire. *See* FCC Local Competition Report, Table 9.

40.  The PUC's final cost of capital of 8.2 percent is the lowest established by any state public service commission in the region in which Verizon does business. For example,

---

[10]  *See* Exhibit 9 in Support of Plaintiff's Motion for Preliminary Injunction, Dr. James H. Vander Weide, Rebuttal Testimony on Cost of Capital, Submitted on Behalf of Verizon New England Inc., d/b/a Verizon New Hampshire, DT 02-110, at 27 (Mar. 11, 2003).

15

Delaware, Maryland, Virginia, West Virginia, New York, and Massachusetts have all adopted cost of capital figures that are higher than 10 percent.

## COUNT I

41. Verizon realleges and incorporates by reference the allegations contained in ¶¶ 1-40 above.

42. The PUC's *Cost of Capital Order* is contrary to law because it adopts a cost of capital, and results in UNE rates, that violate the FCC's binding TELRIC rules and sections 251 and 252 of the Act.

## COUNT II

43. Verizon realleges and incorporates by reference the allegations contained in ¶¶ 1-40 above.

44. The PUC's adoption of a cost of capital of 8.2 percent is arbitrary and capricious under federal law.

## PRAYER FOR RELIEF

WHEREFORE, pursuant to 47 U.S.C. § 252(e)(6) and 28 U.S.C. §§ 1331, 2201-02, Verizon respectfully requests that this Court grant the following relief:

1. That the Court vacate the PUC's *Cost of Capital Order*, including its final cost of capital determination of 8.2 percent.

2. That the Court reinstate the PUC's previously adopted cost of capital of 10.46 percent unless or until the PUC sets a new cost of capital figure that complies with TELRIC.

3. An injunction prohibiting the Defendant from taking any action to enforce the unlawful provisions of the *Cost of Capital Order*.

4. An award of Verizon's costs, attorneys' fees, and such other relief as the Court deems just and reasonable.

Respectfully submitted,

VERIZON NEW ENGLAND INC.

By its attorneys:

Dated: February 19, 2004

Bruce P. Beausejour
Victor D. Del Vecchio
VERIZON NEW ENGLAND INC.
185 Franklin St.
Room 1303
Boston, MA 02110
(617) 743-2445

Thomas J. Donovan #664
MCLANE, GRAF, RAULERSON & MIDDLETON,
PROFESSIONAL ASSOCIATION
900 Elm Street
P.O. Box 326
Manchester, NH 03105
(603) 625-6464

Lynn R. Charytan
Samir Jain
WILMER CUTLER PICKERING LLP
2445 M Street, NW
Washington, DC 20037-1420
(202) 663-6000

17

## Certificate of Service

I hereby certify that on February 19, 2004, I served the foregoing Complaint by hand delivering copies thereof to Daniel J. Mullen, Chief of Staff of the Office of the Attorney General, counsel to the New Hampshire Public Utilities Commission, and to Amy L. Ignatius, Esq., General Counsel of the Public Utilities Commission.

_____
Thomas J. Donovan